58 CCPA

**Application of Hugh Harper GIBBS and Richard Norman Griffin.**

**Patent Appeal No. 8367.**

United States Court of Customs and Patent Appeals.

Feb. 11, 1971.

Frank C. Hilberg, Jr., Gerald A. Hapka, Herbert W. Larson, Wilmington, Del., attorneys of record, for appellant.

S. Wm. Cochran, Washington, D. C., for the Commissioner of Patents. Leroy B. Randall, Bethesda, Md., of counsel.

Before RICH, ALMOND, BALDWIN and LANE, Judges, and RE, Judge, United States Customs Court, sitting by designation.

RICH, Judge.

This appeal is from the decision of the Patent Office Board of Appeals affirming the examiner's rejection of claims 1–3 in application serial No. 290,184, filed June 24, 1963, for "Trifluorovinyl Sulfonic Acid Polymers." The real party in interest is E. I. du Pont de Nemours and Company, assignee. We reverse.

The same applicants who are appellants here were issued a patent, assigned to duPont, No. 3,041,317, on June 26, 1962, which was less than a year before the filing of the application on appeal. That patent is the sole reference relied on to support the rejection.

The ground of rejection is that claims 1–3 are unpatentable under 35 U.S.C. § 102(c) [1] because the invention claimed thereby has been "abandoned." Such abandonment is predicated solely on the issuance of the patent, which is alleged to disclose the subject matter without claiming it, and on the fact that the instant application, wherein it is claimed, was not copending with the application on which the patent issued. It was the examiner's final position as stated in his Answer before the board that the claimed subject matter was "dedicated" to the public by failure to claim it in the issued patent wherein it was disclosed. The examiner's words were: "Appellants have dedicated the disclosure of the present application in Gibbs et al and have effectively abandoned their invention for patenting purposes * * *." The authority he relied on was McCrady, Patent Office Practice, 4th ed., p. 182.

Apparently because the examiner in his first action rejected the claims on the Gibbs et al. patent "on the grounds

---

1. This statute reads:

§ *102. Condition for patentability; novelty and loss of right to patent*

A person shall be entitled to a patent unless—

    *      *      *      *      *

  (c) he has abandoned the invention,

  *   *   *.

of double patenting" (among other grounds), although in his second action he changed it to dedication and abandonment under § 102(c), duPont, as assignee, filed a terminal disclaimer [2] and cited the two double patenting cases of In re Robeson, 331 F.2d 610, 51 CCPA 1271, and In re Kaye, 332 F.2d 816, 51 CCPA 1465 (1964), in which we held terminal disclaimers effective to overcome a "double patenting" rejection. Those cases had nothing whatever to do with either abandonment or dedication. In his Answer, the examiner said:

> Appellants' arguments with respect to the terminal disclaimer are moot since no double patenting rejection is being maintained.

The board opinion, while recognizing the existence of the terminal disclaimer as part of appellants' argument "based upon double patenting considerations," makes no further mention of it. Appellants, in their brief in this court, continue to rely on the disclaimer for reasons discussed hereinafter. This presents a novel aspect in a case wherein the rejection is predicated on § 102(c) abandonment, the sole ground on which the board affirmed.

### The Invention

Claim 1 exemplifies the subject matter of the application. It reads:

> 1. A normally solid acid ion exchange resin polymer of trifluorovinyl sulfonic acid containing units of the structure
>
> $$—CF_2 —CF— \quad ,$$
> $$SO_3 \ X$$
>
> where X is a member of the class consisting of hydrogen, alkali metals, ammonium ions and amine ions.

Claim 2 is nearly the same except that the resin is stated to be a *copolymer*, rather than a "polymer," of a fluoroethylene *and* the trifluorovinyl sulfonic acid specified in claim 1. Claim 3 depends from claim 2 and specifies that the fluoroethylene component is *tetra*fluoroethylene.[3]

### The Rejection

The rejection in this case is one which, the Patent Office admits, is rarely applied. Consequently there is little recent case law on the subject. The statutory ground of "abandonment of the invention" is predicated on the fact, which is not in dispute, that the subject matter of the appealed claims is to some extent disclosed in the Gibbs and Griffin patent and is not claimed therein or in any application copending with the patent. It is therefore said to be "dedicated" to the public and that dedication is equated by the Patent Office with the abandonment referred to in § 102(c).

We shall now briefly explain in what manner the invention of the appealed claims is disclosed in the issued patent. The acid ion exchange resin polymers or copolymers of the claims are referred to generally by appellants as "polyacids". The application at bar says:

> The polyacids of the present invention are prepared by the *hydrolysis* polymers of trifluorovinyl sulfonyl *fluoride*. The polymerization of trifluorovinyl sulfonyl fluoride is disclosed in our patent U. S. 3,041,317, issued June 26, 1962. * * *

> The polytrifluorovinyl sulfonic *acids* are of particular *utility* as *ion exchange resins* and as *acid catalysts*. * * * the polyacids generally employed are copolymers of trifluorovinyl sulfonic acids with fluorinated ethylenes, and, particularly, tetrafluoroethylene * * *. [Emphasis ours.]

The Gibbs et al. patent contains a full description of the preparation of the aforesaid *fluorides*, their polymerization or copolymerization, and specifically the production of copolymers with tetraflu-

---

2. The disclaimer, which was accepted and recorded, merely "disclaims all that portion of the term of any patent issued on said application subsequent to June 26, 1979," which is the expiration date of the reference patent, No. 3,041,317.

3. Polymerized tetrafluoroethylene is best known to the general public by its trademark designation "Teflon." See definition in The Random House Dictionary of the English Language (1967).

oroethylene. The concluding paragraph of the patent contains this statement:

> The polymers of the present invention serve many purposes. * * * However, a particular utility of the polymer comprises its use *as an ion exchange resin after hydrolysis*[4] of the sulfonyl fluoride group to the sulfonic *acid* group. [Emphasis ours.]

That is the totality of the disclosure of the now-claimed polyacids. Thus, the patent discloses the production of the polymerized fluorides and then contains the broad statement that by hydrolysis they can be converted into the polyacids now claimed and states what the latter will be useful for. The patent does not disclose how to carry out the hydrolysis, as does the present application, nor does it specifically name any of the resulting polyacids.

The essence of the rejection is that by this much disclosure, coupled with failure to claim in the patent *or* in a *copending* application, the invention of the polyacids was abandoned in the sense of § 102(c) and no patent can issue.

The board so held on the ground that the fluorides of the patent and the polyacids of this application are "mutually dependent inventions," predicating the dependency on its findings that (a) the polyacids claimed here require the fluorides of the patent as a *starting material*, saying, "No other method for producing the herein claimed polymer is disclosed," and (b) the "major *utility disclosure* in the patent is directed to the hydrolysis of the sulfonyl fluoride copolymer to the corresponding sulfonic acid copolymer which is useful as an ion exchange resin * * *." (Our emphasis.)

The legal significance of this holding of mutual dependency will appear hereinafter.

*Appellants' Points*

Appellants' arguments before us are that the issuance of the patent did not constitute an "abandonment" but merely gave rise to an inference or presumption of dedication which is effectively rebutted by the filing of this application claiming the supposedly dedicated subject matter before the patent became a statutory bar under § 102(b); that to hold that issuance of the patent amounted to an irretrievable dedication of unclaimed subject matter is directly contrary to the reissue statute, 35 U.S.C. § 251, which allows up to two years to retrieve unclaimed subject matter in a proper case; that they could not have made the claims at bar in a reissue because the patent does not contain sufficient enabling disclosure in that it does not describe how to carry out the hydrolysis; that a stranger independently making the invention could patent it notwithstanding the issuance of appellants' patent on an application filed within a year of its issuance, wherefore it is inequitable that appellants are unable to do so; that if any question of an extension of patent monopoly is here involved, their terminal disclaimer would prevent such extension; and that the cases relied on by the Patent Office are distinguishable.

## OPINION

The concept of abandonment of an invention is not a simple one and the meaning of the phrase is not self-evident, as perusal of any textbook dealing with the subject will show. For example, Deller's Second Edition of Walker on Patents, Chapter VII, entitled "Abandonment," devotes 94 pages to a variety of subjects with most of which we are not here concerned. Rivise and Caesar's Patentability and Validity (1936), deals with the subject in the 70-

---

4. "Hydrolysis" is defined in Hackh's Chemical Dictionary, 3d Ed., as "A decomposition reaction caused by water. In general, a reaction of the type

$$AB + H_2O = AOH + HB$$

which, in its ionic form, $H_2O = H^+ + OH^-$, is the reverse reaction of neutralization.

page chapter XII entitled "Forfeiture of Right to Patent Protection," which gets closer to the mark in pointing out, § 278, p. 515:

> At the very outset it must be emphasized that the term "abandonment of the invention" as used in the patent law does not necessarily mean that the inventor has lost or given up the right to practice his invention. What it does mean is that the inventor has waived or forfeited his right to patent protection; i. e. the right to exclude the public in general from making free use of his invention.

We are not at all concerned, therefore, with any abandonment of the invention in the sense of the *thing invented* but only, in the words of the § 102 heading, with "loss of right to patent," an inability to obtain that incorporeal property right (35 U.S.C. § 261) which is the right to exclude others from making, using or selling the invention (35 U.S.C. § 154).

Delving further into the problem, we next encounter the fact that "abandonment" is of two general types, actual and constructive. Rivise and Caesar, op. cit. § 279, say:

> It is said to be "actual" when it is the result of intention. It is said to be "constructive" when it occurs irrespective of the inventor's intention, as by the operation of some statute. For this reason constructive abandonment is often referred to as "statutory forfeiture."

For example, if the invention has been described in a printed publication or has been in public use or on sale for more than a year before the filing of the application in the United States, forfeiture of the right to a patent results automatically by virtue of § 102(b). The text writers appear to consider this to be constructive "abandonment" under § 102(c) notwithstanding it would clearly be "overkill" to have two separate statutes to deprive the inventor of his right to a patent because of the same fact. We are not here concerned, how-

ever, with such an abandonment since no prior art has been relied on and there has been no public use or placing on sale or other bar under the statute. Appellants filed their application within one year of the effective date of the only reference—their own patent. Prima facie, appellants are within their *statutory* rights. So much for constructive abandonment. We turn to actual abandonment.

Actual abandonment is, again, divided into two categories, express and implied. In § 279, Rivise and Caesar further say:

> It is said to be "express" when the inventor indicates by express words that he does not seek patent protection, or that he does not intend to preclude the public from availing itself freely of the benefits of his invention.

There has been no suggestion of express abandonment in this case. The contention here is simply that there is *implied* abandonment based on the fact that the inventors took out their patent, disclosing but not claiming the polyacids which are now being claimed, and in permitting a "hiatus" to occur between the patenting and the filing of the application at bar. Without the hiatus—that is to say, if there had been copendency between the application for the patent and the present application—the Patent Office impliedly concedes that there would have been no dedication and no statutory abandonment. Whether conceded or not, such has long been the law. See discussion in Amdur, Patent Law and Practice (1935), pages 347–355.

Because of emphasis by the examiner and the board on the fact that the hiatus was "nearly a year" (examiner) or "almost one year" (board), we wish to make it clear that we deem it of no significance on the issue before us whether the duration of the hiatus was one or 364 days, since the application was filed within the one-year statutory grace period allowed by § 102(b). If the law permits of *any* delay after the patent issued, we think it allows up to a year. The issue is whether *any* delay is neces-

sarily fatal. Otherwise stated, it is whether copendency is essential to prevent "abandonment" by this kind of dedication through disclosure in a patent with failure to claim.

As the case law has evolved, that is not a question to which precedents provide a clear and simple answer. The answer of the board in this case was: In certain cases no; but in this case yes. The Solicitor for the Patent Office was of like mind. Having examined the cases, we find them not only in conflict but in many instances unclear in their reasoning. The text writers have tried to make sense out of opinions that sometimes make no sense resulting in a vast clutter of unrelated concepts and acts subsumed under the general heading of "abandonment." The passage from McCrady on which the examiner relied states that "(according to the overwhelming weight of authority) what he [i. e., the applicant] disclosed but did not claim is dedicated." In the footnote in support, the "overwhelming weight" consists of three cases for the proposition, two of which are not in point, one case "contra," and Ex parte Mullen, 1890 C.D. 9, 50 O.G. 837. The *Mullen* case is on both sides of the statement and is a good starting point for discussion.

Ex parte Mullen and Mullen is a classic in this area of the law. The board in the present case was obviously trying to follow it. It is constantly referred to in subsequent opinions. It was a petition to Commissioner of Patents Mitchell from an examiner's refusal to examine an application because the claims "cover subject-matter shown but not claimed in an earlier patent granted to the same inventors seven days prior to the present application." The examiner contended that applicants' only remedy lay in applying for a reissue. The Commissioner disagreed about the possibility of reissue and found the examiner in error and ordered him to examine. It may be noted

before going further that *Mullen*, so far as its *decision* is concerned, is a holding that matter disclosed but not claimed in a patent is *not* necessarily dedicated to the public or legally abandoned under the statute, which contained the same requirement of no abandonment in 1890, even where there is a hiatus (seven days in *Mullen*) and hence no copendency. In the course of his thinking, Commissioner Mitchell divided all applications into three categories "with reference to that aspect of the question of division which is here involved." [5] Briefly stated, his three categories were:

1. A second application claiming the *same* invention claimed in the patent.

2. A second application claiming an invention "distinct" from any invention claimed in the patent but, with respect thereto, mutually contributing to a "single result."

3. A second application claiming an invention "absolutely independent" of the invention claimed in the patent.

He stated what he considered to be the law in these three situations as follows:

1. The second application cannot be sustained. There can be only one patent where there is only one invention. (It will be observed that this has no bearing whatever on the *problem of dedication or abandonment*. What it actually involves is questions of double patenting.)

2. Issuance of the patent raises a presumption of dedication, based on disclosure without claiming, because the invention claimed in the application could have been claimed in the patent; but the presumption is repelled if the invention is claimed in a *copending* application *or* if there is a *reservation* in the patent and *after* its issu-

---

5. Just how it was a question of "division" is not clear. Apparently it was regarded as such because the subject matter could be considered as divided out of the patent wherein it was fully disclosed, but after its issuance. It is believed that this would not be considered today as "division."

ance an application is filed "without laches or delay" (citing old cases and noting also that reservations had been done away with in Rule 44 in 1888—cf. present Rule 79 to the same effect).

3. No presumption of dedication arises because the invention could not have been claimed in the patent and it can be claimed in any application against which there is no statutory bar, regardless of when filed.

Commissioner Mitchell then examined the inventions claimed in the patent and application, both of which related generally to grain drills. While it could logically have been said they mutually contributed to the "single result" of planting grain, the Commissioner found that the patent claimed feed-regulating devices and the application claimed the spring mounting of the drill teeth and ruled these were "clearly independent" inventions *because they could not have been claimed in the same case* under the Patent Office rules. This put them in category "3", there was no dedication, the second application was considered proper notwithstanding the hiatus, and the examiner was told to examine it. Clearly, what was said about the law respecting categories "1" and "2" was dictum and equally clearly this court is not bound by a ruling of a Commissioner of Patents in 1890, regardless of how ingrained his ruling may have become in Patent Office practice. As we have indicated above, category "1" is irrelevant. As to category "2" there is respectable and higher authority contrary to the view of Commissioner Mitchell to be found in Shipp v. Scott School Township, 54 F.2d 1019 (7 Cir. 1931). The opinion states that the invention claimed in the patent in suit had been disclosed but not claimed in earlier patents to the patentee which issued before he filed his application. The court's holding is clear from the following quotation:

> Generally speaking, the filing of an application for a patent, which application discloses novel features without

making accompanying claims to all of the novel features disclosed, and the acceptance of a patent thereon, give rise to the legitimate inference that the applicant intended to dedicate to the public the unclaimed novel features of his invention. In other words, it is fairly inferable from such action that the inventor intended to waive his right to a patent monopoly upon the unclaimed novel features of his invention. But does such action on his part *conclusively* establish dedication? We think not.

\* \* \* \* \* \*

There is, we think, a limitation to the inference of dedication which arises when the inventor within the time fixed by statute files another application for the unclaimed novel features referred to. In reaching this conclusion, we are not unmindful of the fact that the public is interested in every patent and in the period of its duration. Nor have we overlooked the possible effect of the Reissue Statutes. However, the statute fixes the time within which an applicant may make application for a patent on his inventions, and, so long as he acts within the time fixed, he is strictly within his legal rights.

Getting back to the original proposition that waiver and dedication are both ordinarily questions of fact, it becomes necessary for the court to place applicant's act in failing to claim all of his discovery against his other act of filing another application, within the time permitted by statute, wherein he made claim to the disclosed but uncovered features of his first application. If no other fact appears bearing upon the issue of waiver, it would seem, upon this showing, that a finding in the inventor's favor would be unavoidable.

The District Court for the District of Connecticut followed the *Shipp* case in Benoit v. June Dairy Products Co., D.C., 21 F.Supp. 52 (1937), wherein the second application claimed another species from that claimed in the patent which dis-

closed it, the application being filed after the patent issued, the period of hiatus being just under the two years of grace allowed by the former statute. The claim of dedication was made. The court rejected it. Still later the Seventh Circuit Court of Appeals cited its own *Shipp* opinion with approval in Micon v. Burton-Dixie Corp., 147 F.2d 19 (1945), referring again to the "statutory period" which alone places the time limitation on a patentee to apply for patent on what he has disclosed but not claimed.

In Ex parte Spence, 82 USPQ 449 (1946), the Board of Appeals reversed a rejection on applicant's issued patent on the theory that disclosure without claiming constituted dedication. There was a hiatus of 18 days between issuance of the patent and the filing of the application. The board found the claims to be in *Mullen* category "3" and also cited the *Shipp* and *Benoit* cases, supra. It made these further observations:

> Under the present law, public use or disclosure in a printed publication is not a bar against the issuance of a valid patent provided the patent is applied for within less than a year of the date of said publication or public use. Had the valve been disclosed by appellant in a printed publication as an advertisement of his product, such publication obviously would not be a bar to the grant of a valid patent provided the patent was applied for within the year following such publication. It is not seen that there is any difference between the disclosure by way of a trade journal or in a patent in which the valve is not claimed.
>
> We are of the opinion that appellant was clearly within his rights when he delayed filing the present application until after the first patent had issued. One might infer that since the valve disclosed in said patent was not claimed therein, that it had been dedicated to the public, but this inference can be rebutted by the subsequent filing within the statutory period of an application claiming the valve per se.

Three decisions of this court have been cited. The one the board stated it considered to "most nearly approach" the present case is In re Bersworth, 189 F. 2d 996, 38 CCPA 1167 (1951). We have carefully studied the opinion in *Bersworth* and we are unable to see that it really involved a dedication or abandonment situation. Claims 1–6 were on appeal and they were rejected in view of two prior Bersworth patents. Applicant tried to distinguish claims 1–5 from what was disclosed and claimed in the issued patents on the basis of an allegedly "critical" temperature range in a reaction. The patents disclosed a range of 30–100°C. and the "critical" range was 95–99°C. It seems quite evident that the patents did not disclose the latter except as it was included within the broad range and consequently did not disclose the *invention* being claimed in the application. From the opinion it appears that the examiner held the conditions of the patents were "*similar* to those claimed in the application, except for the specific temperature range" and that there was "*no invention* in performing the reaction of the patent at any temperature *within* the range." (Emphases ours.) This court referred to the "*broad* unclaimed disclosure of the earlier patents" (our emphasis) which confirms our belief that the specific narrow range of temperatures claimed in the application was not disclosed per se in the patents. There could have been no dedication without a disclosure. The discussion of *Mullen* by the board, as quoted in this court's opinion, seems to have been beside the point. As to claim 6, it was said to fall within *Mullen* class "1" which we have already pointed out is not a dedication situation but, as the board said in *Bersworth*, a question of double patenting. As to claim 6 the examiner had held that its limitation to low positive pressure of ammonia gas, relied on for patentability, was "no more than would be expected." So far as we can see the Bersworth patents were treated as prior art and the rejection was basically predicated on obviousness as witnessed by the

penultimate paragraph of the opinion which says, in concluding a page of discussion, that the alleged new and improved results were "not sufficient to show 'criticalness'." In any event, there is no mention of abandonment anywhere in *Bersworth* as the ground of rejection.

The second decision of this court, referred to in *Bersworth* as "relevant" as well as by the board, is In re Phillips, 148 F.2d 662, 32 CCPA 901 (1945). Although its opinion contains the bromide that what is disclosed and not claimed in a patent is dedicated to the public [6] with citation of three cases in support, the case has nothing to do with dedication or abandonment. There seems to have been a dispute as to whether the subject matter claimed in the application was in fact disclosed in a patent issued to the applicant over 4 months before he filed. The court found a full disclosure of "every detail of the rejected claims." But the irrelevance of the case on the issue before us is clear from two statements in the opinion. The first is that there was "substantial identity between the rejected claims and * * * claims [5 and 6] of the patent * * *." The second is that "the patent of appellant and the claims of his present application present no difference in invention * *." Appellant's patent was one of four references relied on. It seems to have been treated as prior art, the examiner having rejected all claims as reading on appellant's patent. Since the court found substantial identity between the patent claims and the claims on appeal what was

really involved (though not mentioned) was a double patenting case fitting into *Mullen* category "1".

The third and last case in this court is In re Woodling, 210 F.2d 955, 41 CCPA 809 (1954). Two of the five judges declined to join the opinion. The exact ground on which the decision rested is impossible to determine because several are discussed and all applied. It is a case to be classed with *Phillips*, however, in view of this statement:

Inasmuch as the claims of the appellant do not patentably differ from those of the patent, it would seem that our holding in *In re Phillips* * * * is appropriate. In that case, as here, the claims of the application did not patentably differ from those of the patent.

The opinion reports that the rejection of the claims affirmed by the board was on the ground of "dedication" based on a Woodling patent issued one day less than a year before the application was filed. It also reports that the board held that the appealed claims differed from claims in the patent "only in scope," being broader in some respects and narrower in others, but were "for the same species of method." The court's opinion expressed agreement with that evaluation. Under the *Mullen* classification, this would put the case into category "1" as a double patenting rather than an abandonment-by-dedication situation and of no value on the latter problem with which we are here involved. Though the court affirmed a "dedication" rejection,

6. We have observed that this oft-repeated statement frequently occurs in the context of a discussion of *infringement* and what it is that the patent *covers*, being the equivalent of a statement that patent *protection* is determined solely by the claims, rather than the disclosure. One example is what Judge Learned Hand said in the case cited at the end of the solicitor's brief, Picard v. United Aircraft Corp., 2 Cir., 128 F.2d 632, 637. The solicitor copied a misquotation from Deller's Walker on Patents, 2d Ed., 674. What Judge Hand said was:

As a general principle a patentee dedicates or surrenders all that he dis-

closes except so far as the claims reserve it. [Cases cited. Emphasis ours.] By "dedication" in such a context it is meant that subject matter not claimed is not subject to the monopoly or property right of the particular patent under discussion. A modicum of thought will demonstrate, as can be seen from the cases we are discussing herein, that the public does not necessarily get free use of an invention merely because in a particular patent it is disclosed and not claimed. It may be and often is claimed in another patent.

it is impossible to tell what either it or the Patent Office considered was dedicated.

To return to the present case, assuming, *arguendo,* that appellants' patent contains a disclosure of the invention now being claimed, in an application filed less than one year after the patent issued, the claimed subject matter clearly not being the same, was it "abandoned" by the issuance of the patent? We think not. The determination made below that appellants had abandoned their right to patent the subject matter now claimed is a conclusion of law predicated on a mere inference of dedication drawn from the facts of disclosure and failure to claim. This inference may be rebutted in several ways: by an application for reissue of the patent pursuant to statute, § 251, last paragraph, which seems to permit a broadening reissue application to be filed up to two years after the patent issues; it can unquestionably be rebutted by claiming in a copending application before the patent issues and possibly even thereafter. We see no logical reason why it cannot also be rebutted in all cases, as has been held, by the filing of an application within the one-year grace period following the issuance of the patent before the patent has become a statutory bar under § 102(b). So far as the statutes are concerned, an inventor clearly has that right. We do not think that the *Mullen* dictum was respect to category "2" applications states an adequate reason for depriving him of that right. There is too much uncertainty as to what makes inventions "mutually dependent" or when they "contribute to a single result." These are vague concepts on which men may reasonably differ and on which the Patent Office practice respecting division or restriction can vary and has varied through the years so that it cannot be determined with any certainty whether or not inventions in category "2" can or cannot be prosecuted in the same application or claimed in the same patent. It is noted, furthermore, that as to the *Mullen* category "3", or "absolutely independent" inventions,

there has never been any question that the inference of dedication is rebuttable by an application filed at any time before a statutory bar arises.

At the argument appellants' counsel cited Struthers Scientific Corp. v. General Foods Corp., 166 USPQ 527 (D.C. Del., 1970). In that case, in support of a motion for summary judgment to declare three patents invalid, one of the grounds was that:

> (3) The claimed subject matter of the '129 patent was abandoned under 35 U.S.C. § 102(c) during the course of Struthers' prosecution of its '302 claim in the U. S. Patent Office.

Answering the above contention, the court said:

> Fourth, the question whether the subject matter claimed in the '129 patent was abandoned is also one of fact. Abandonment is never presumed and must be proved by the person asserting it by clear and convincing evidence. Furthermore, whether there was an abandonment of '129 claims turns in part upon the divisional practice in the Patent Office. These matters need further amplification and cannot be ruled upon at this stage simply as a matter of law.

We conclude, therefore, that appellants here have rebutted the inference of dedication by filing the instant application and that there is no ground for holding the invention of the appealed claims to have been abandoned under § 102(c).

We have found nothing in the *Phillips, Bersworth,* or *Woodling* cases, supra, compelling a contrary conclusion and anything therein deemed to be contrary to this decision may be taken as overruled.

The ground of this decision makes it unnecessary to consider the terminal disclaimer filed by appellants' assignee.

We have also found it unnecessary to consider whether the disclosure of the patent would have been sufficient to support the appealed claims if they had been presented in the application which ma-·

tured into the reference patent or in an application to reissue it.

The decision of the board is reversed.

Reversed.

ALMOND, Judge (concurring).

I agree that we should reverse the decision below. My reasons for doing so, however, are different from those expressed in the majority opinion, with which I cannot agree.

The majority opinion, in effect, does away with the long recognized doctrine of dedication. In so doing, the majority attempts to distinguish the three pertinent decisions of this court in In re Woodling, 210 F.2d 955, 41 CCPA 809 (1954); In re Bersworth, 189 F.2d 996, 38 CCPA 1167 (1951); and In re Phillips, 148 F.2d 662, 32 CCPA 901 (1945). I do not find the attempt to distinguish these cases convincing and believe that we must either follow them or overrule them completely. It is noted that the majority opinion does state that anything in *Phillips, Bersworth,* or *Woodling* deemed to be contrary to the instant decision may be taken as overruled. I would, however, follow the precedent set forth in these decisions.

The majority would distinguish all three cases on the grounds that the facts in those cases involve double patenting and not dedication. This is despite the unequivocal language in the *Phillips, Bersworth,* and *Woodling* opinions to the effect that the issue being resolved was one of dedication. Note, for example, the statement in *Phillips* that:

> Since the involved application was not filed until several months subsequent to the issuance of appellant's patent, what he disclosed and did not claim must be considered dedicated to the public.

Likewise, Judge Worley states in *Woodling:*

> Again reverting to the matter of dedication, we find ourselves in agreement with the Board of Appeals that the instant process claims are not patently distinct from the patented

process claims; that they are based upon identical disclosures; and that there was no copendency between the patent and the application at bar. In light of those facts, Woodling's failure to claim the involved subject matter by timely application for reissue instead of waiting nearly four years to present claims thereto in a separate application, clearly constitutes dedication.

In addition, the facts in these three cases actually raise the dedication issue. All three opinions make it clear that the appealed claims were rejected over the disclosures of the patents, found to have been dedicated, and not on the patent claims alone. In *Phillips,* for example, while there was a "substantial identity between the rejected claims and * * [the] claims of the patent," a difference did exist in the limitation to a nonadhesive zone between the alinement guide and the adhesive zone, but this difference was "clearly shown in the patent drawings and could have been described and claimed by amendment." In *Bersworth,* as the majority opinion points out, it was stated that claim 6 might fall within class (1) of Ex parte Mullen, 1890 C.D. 9, 50 O.G. 837 (which is a double patenting question). However, it is noted that the Bersworth opinion goes on to state that the board was of the "opinion that all of the claims, with the possible exception of claim 6 fell within class (2)" of *Mullen* (which clearly involves dedication). It was to this latter issue that the *Bersworth* opinion was directed.

Since *Phillips, Bersworth,* and *Woodling* cannot be distinguished, they must be considered overruled completely. However, I am not prepared to do so. Established precedent should stand except when there are sound and overriding reasons to the contrary. One need only look at the textbook authorities cited by the majority to ascertain that the dedication doctrine is a well-established one in the patent field. Nor am I persuaded that there are any sound and overriding reasons presented by the majority for destroying such a long exist-

ent doctrine. This is despite the fact that it may have fallen into relative nonuse in recent years and that there is some uncertainty involved in determining when the facts of a particular case fall into class (2) of *Mullen.* Many areas of patent law involve just as much, if not more, uncertainty.

The majority opinion states that filing an application within the one-year grace period following the issuance of the patent is one means of rebutting the inference of dedication drawn from the facts of disclosure and failure to claim. According to the majority, other means of rebutting this inference are filing a reissue application and claiming the invention in a copending application. Contrary to this analysis of the statutes, I believe that the reissue avenue under § 251 is intended to be the only means of claiming that which is disclosed but not claimed in the patent or a copending application. There are certain requirements in paragraph 1 of § 251 which must be met before a patent can be reissued. That is, the patent must be "through error without any deceptive intention, deemed wholly or partly inoperative or invalid," the patent must be surrendered, and the term of the reissue patent is only the unexpired part of the term of the original patent. No such safeguards exist if the inference of dedication is rebutted by the mere filing of an application within one year. The monopoly is certainly going to be extended, two patents will be in existence rather than one, and the mere filing of the application can conclusively rebut the in-ference of dedication without anything more shown about why the invention had not previously been claimed. I cannot believe that such a result was intended by Congress.

Under my analysis of this case, it is not necessary to even reach the issue of whether filing an application within one year rebuts the inference of dedication. In my opinion, the invention being claimed could not have been claimed in the patent, thus the facts fall within class (3) of *Mullen.* This is because the patent does not contain a sufficient enabling disclosure of how to carry out the hydrolysis and make the various sulfonic acid polymers. As the majority points out, the only disclosure in the patent of the polyacids is in one sentence:

> \* \* \* a particular utility of the polymer comprises its use as an ion exchange resin after hydrolysis of the sulfonyl fluoride group to the sulfonic acid group.

Clearly this is not a sufficient disclosure upon which to base claims to a large number of different polyacids. In fact, I suspect that had appellants tried to claim them the Patent Office would have immediately rejected such claims under 35 U.S.C. § 112 as being based upon an insufficient disclosure. In such a situation, there is certainly no presumption of dedication and appellants are free to claim the polyacids in any application against which there is no statutory bar, regardless of when filed. Therefore, I would reverse for this reason and this reason alone.